David S. Stone
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (908) 464-3010
*Attorneys for Plaintiffs Genever Holdings, LLC and*
*Miles Kwok*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENEVER HOLDINGS, LLC and MILES KWOK,<br><br>                    Plaintiffs,<br><br>        v.<br><br>THE SHERRY-NETHERLAND, INC.,<br>MICHAEL J. ULLMAN,<br>ROBERT WIENER, GUSTAV<br>RESTORATION LLC,  XYZ<br>CORPORATIONS 1-10, and JOHN and JANE<br>DOES 1-10,<br><br>                    Defendants. | Civil Action No.<br><br><br><br>**VERIFIED COMPLAINT** |

Plaintiffs, by and through their attorneys, STONE & MAGNANINI LLP, as and for its

Verified Complaint against Defendants The Sherry-Netherland, Inc., Michael J. Ullman, Robert

T. Wiener, Gustav Restoration LLC, XYZ Corporations 1-10 and John and Jane Does 1-10

(collectively, "Defendants"), set forth as follows:

### INTRODUCTION

1.      This is an action involving gross misconduct by Defendant Sherry-Netherland,

Inc. (the "Hotel") and its Management in connection with its handling of an incident involving

one of its most prestigious residents and one of its most expensive apartments.

2.     Although the Hotel holds itself out to be a first class cooperative residential hotel with unparalleled service, the facts of this case show just the opposite.  Without proper notice, and in a negligent manner, Management accessed Plaintiffs' apartment, tore up their terrace, negligently punched a hole in their wall damaging a valuable antique wallcovering, apparently ruined their terrace's irrigation system causing irreparable injury to the plants, allowed valuable personal belongings and artifacts to be removed from the apartment and caused other serious harm to the property.

3.     All of this was in an attempt to prevent a leak resulting from a rainstorm that was ultimately found by Plaintiffs' insurance investigator to be caused by a corroded roof drain pipe, which had clearly been negligently maintained by the Hotel.  After doing all of this, instead of apologizing for its outrageous conduct, Defendant Michael Ullman, Executive Vice President and Chief Operating Officer of the Hotel, attempted to stick Plaintiffs with the bill for all of the damages the Hotel caused and the unnecessary so-called "repair" work it had performed.

4.     In investigating the matter, Mr. Kwok and his family learned that he had been required to pay a significantly higher deposit (5 years of escrowed maintenance fees at $3,000,000, rather than the customary 3 years) than any other tenant in the Building, apparently based upon the fact that he is a Chinese citizen.

5.     More importantly, a contractor who had executed all of the work in the creation of Plaintiffs' apartment, upon inspecting the apartment after the alleged water damage, stated that he would be concerned about the integrity of the mortar and the stability of the bricks and ornamental stones on the south wall of the hotel, which could pose a danger to Hotel residents and the public.

2

6.    Because the Hotel continues to maintain that, in case of future rainstorms, Plaintiffs will be responsible for all ensuing damages if they do not perform expensive and unnecessary repairs to Unit 18's terraces, and because of the potential risks posed to Plaintiffs and the public arising out of the potential structural damage identified, Plaintiffs seek expedited discovery and emergent relief to avoid any further irreparable harm.

## NATURE OF ACTION

7.    Plaintiffs seek a preliminary injunction and permanent injunctive relief and damages for Defendants' misconduct in (a) accessing Plaintiffs' cooperative residential hotel apartment without sufficient notice or consent to effectuate so-called "repairs" of Plaintiffs' terraces that Defendants assert resulted in alleged water-related damages to apartments above and below Plaintiffs' apartment, (b) converting personal property from Plaintiffs' apartment, (c) negligently permitting personal property to be removed from the apartment, and (d) unlawfully discriminating against Mr. Kwok based on his national origin.

8.    A thorough inspection of Plaintiffs' terraces by a licensed insurance adjuster revealed that the terraces had not caused the alleged damages. Instead, the adjuster found that a drain stack pipe that the Hotel is responsible for maintaining and repairing had been so severely clogged and corroded that it had begun to leak and damaged apartments both above and below Plaintiffs' apartment.

9.    The Hotel's own incident reports support the adjuster's findings. Despite knowing this, the Hotel nevertheless forwarded Plaintiffs an invoice for $33,520.58 for unnecessary construction-related work it directed be performed by its own contractor (Defendant Gustav Restoration LLC ("Gustav")) at Plaintiffs' apartment.

10.   The Hotel did not include copies of its incident reports when it provided the invoice to Plaintiffs, suggesting that the Hotel may have sought to conceal the fact that the work it directed be performed on Plaintiffs' terraces was pointless.

11.   Plaintiffs did not receive notice that Management had accessed their apartment and terraces and performed substantial work. Plaintiffs were never notified that Gustav would be conducting extensive work on their apartment's terraces. Nor were Plaintiffs, or any of their representatives, ever present when the Hotel and/or Management and the contractors were in their apartment or on their terraces.

12.   Upon returning to the apartment after City and Suburban and/or Gustav had allegedly performed "repair" work, Plaintiffs observed, among other things: (a) that the terraces had been tampered with, (b) damages to the interior of the apartment (including holes in the walls), and (c) valuable personal belongings and artifacts missing from their display cases.

13.   The missing items have not been returned to Plaintiffs

14.   Despite what appears to be a clear provision in the lease that the Hotel is responsible for maintaining and repairing the terraces and knowing that Plaintiffs' terraces did not cause the alleged water damages at issue and that therefore Management had erred when it ordered the so-called "repair" work, the Hotel and/or Management insist that Plaintiffs pay the $33,520.58 invoice immediately, as well as incur costs in excess of $60,000 to "repair" the apartment's other terraces.

15.   The Hotel has taken the position that Plaintiffs need to tear up two terraces and fully repair them immediately, and that because Plaintiffs' terraces continue to cause leaks that are damaging other apartments, each time there is a weather event that results in similar water damage to other apartments, the Hotel and/or Management will hold Plaintiffs responsible.

4

16.     To avoid (a) being in breach of Genever's proprietary lease with the Hotel for not abiding by its misinformed directive to repair an undamaged terrace or by not paying the aforementioned invoice, and (b) additional charges for future water damage, Plaintiffs respectfully request an order to show cause that Plaintiffs need not currently conduct any repair work on the terraces or pay the invoice, and are not responsible for similar, future water-related damages that the Hotel may attribute to Plaintiffs' terraces. Plaintiffs also respectfully request that, in light of the circumstances at issue, Plaintiffs be allowed to continue to place their maintenance fees in an escrow account held by this law firm until this matter is resolved.

17.     Moreover, Plaintiffs seek emergent relief in part because of the structural issues associated with the Building's south wall and what potentially may be a safety hazard to both the Hotel's residents and members of the public, including the fallen debris that Plaintiffs have observed on their terraces.

18.     Plaintiffs also seek penalties under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 (the "Fair Housing Act"), 42 U.S.C. § 3601, et seq., to redress discrimination on the basis of race or color for unlawfully discriminating against Mr. Kwok with respect to the duration and amount of maintenance fees the Hotel has required Mr. Kwok, and only Mr. Kwok, to pay. In particular, the Hotel has failed to quote the same maintenance deposit duration and amount to Mr. Kwok, a Chinese citizen and, as such, foreign national, as those the Hotel provided to its other residents.

19.     The Hotel's conduct violates the Fair Housing Act and should be declared unlawful and permanently enjoined, and appropriate money damages should be awarded.

20.     Based on the foregoing, Plaintiffs are seeking expedited discovery to, among other things, flesh out the record concerning (a) Defendants' knowledge of the Building's

structural damage, (b) the extent of the structural damage, and (c) precisely what occurred during the relevant time period when Defendants entered Plaintiffs' apartment and performed repairs outside of Plaintiffs' presence.

## THE PARTIES

21.     Plaintiff Genever Holdings, LLC ("Genever") is a domestic limited liability company formed under the laws of the State of New York and maintains its principal place of business at 80 State Street, Albany, New York.

22.     At all times relevant herein, Plaintiff Miles Kwok ("Kwok") is the Sole Shareholder of Genever and maintains a residence at Unit 18, 781 Fifth Avenue, New York, New York.

23.     Defendant The Sherry-Netherland, Inc. (the "Hotel") is a corporation organized under the laws of the State of New York and maintains its principal place of business at 781 Fifth Avenue, New York, New York.

24.     Upon information and belief, at all times relevant herein, Defendant Michael J. Ullman ("Ullman") is the Executive Vice President and Chief Operating Officer of the Hotel and maintains a residence at 781 Fifth Avenue, New York, New York.

25.     Upon information and belief, at all times relevant herein, Defendant Robert Wiener ("Wiener") is the Director of Security at the Hotel and maintains a residence at 781 Fifth Avenue, New York, New York.

26.     Defendant Gustav Restoration LLC ("Gustav") is a domestic limited liability company formed under the laws of the State of New York and maintains its principal place of business at 19-60 45th Street, Astoria, NY 11105.

27.     Defendant XYZ Corporations 1 through 10 are fictitious corporations meant to represent any additional corporations who have been involved in the conduct that gives rise to this Verified Complaint, but are heretofore unknown to Plaintiffs.  As these Defendants are identified, Plaintiffs shall amend the Complaint to include them.

28.     Defendant John and Jane Does 1 through 10 are fictitious individuals meant to represent the owners, officers, directors, shareholders, founders, managers, agents, servants, employees, and/or representatives of Defendants who have been involved in the conduct that gives rise to this Verified Complaint, but are heretofore unknown to Plaintiffs.   As these Defendants are identified, Plaintiffs shall amend the Complaint to include them

### JURISDICTION AND VENUE

29.     The Court has jurisdiction over this action under 28 U.S.C. § 1331.

30.     This Court has personal jurisdiction over the claims asserted in this action because the Defendants can be found, reside, and/or transact business in New York State and New York County.

31.     Venue is proper in this District because the claims alleged in this action arose in New York County, New York, in the Southern District of New York, and concern or otherwise relate to real property located in this District.

### THE FACTS

32.     Genever is owned and operated by Mr. Kwok, who is the international representative of the Kwok family and their various businesses, which include specifically real estate development.

33.     The Hotel is a luxurious cooperative residential hotel located on Fifth Avenue in Manhattan, across from Central Park.

## The Proprietary and Maid's Leases

34.     Genever entered into a proprietary lease with the Hotel for Unit 18 on or about March 6, 2015 ("Proprietary Lease").

35.     Section 2.1 of the Proprietary Lease provides that the Lessor (i.e., the Hotel) "shall keep in good repair the Building's foundations, sidewalks, walls, . . . supports, beams, roofs, gutters, fences, cellars, chimneys . . . and all main and principal pipes for carrying water, gas or steam through the Building and all drain pipes . . . together with all plumbing, heating and other apparatus intended for the general service of the Building." (Exhibit A, at 4 (emphasis added)). Section 2.1 further provides that "all repairs required to be made by the Lessor shall be at the expense of the Lessor, unless the same shall have been rendered necessary by the wrongful act or neglect or carelessness of the Lessee . . . ." (*Id.* (emphasis added))

36.     Significantly with respect to this action, the Proprietary Lease clearly provides that it is the Hotel's responsibility to repair and maintain the Building's terraces. Section 2.5 of the Proprietary Lease explicitly provides that the Lessor (i.e., the Hotel) is obligated to maintain and repair the terraces: "It shall be the Lessor's duty to keep the Terrace in good repair, subject to reasonable wear and tear and the provisions contained in this paragraph." (*See* Exhibit A, at 6).

37.     Section 3.15 of the Proprietary Lease provides that the Lessee's (i.e., Genever) duty to make repairs "shall not include . . . water or other pipes or conduits within the walls, ceilings or floors . . . which is part of the standard Building equipment." (Exhibit A, at 14-15).

38.     In conjunction with entering into the Proprietary Lease, Genever paid a substantial multi-million dollar "flip fee" and escrowed $3,000,000 for maintenance in connection with the transfer of Unit 18.

8

39.     At the time Plaintiffs paid the maintenance escrow fee, they did so with the understanding that this was the customary deposit required for all Hotel residents.

40.     Upon information and belief, the usual maintenance escrow fee requires three years' worth of payments.   Without explanation, Plaintiffs were required to pay five years' worth.

41.     Mr. Kwok is the Hotel's only Chinse resident.

42.     In connection with the investigation that is the subject of this Complaint, Plaintiffs were informed and now believe that the Hotel required Plaintiffs to pay a discriminatory deposit and that in fact no other Hotel resident has been required to pay five years' worth of fees.

43.     Genever also agreed to pay a monthly co-op maintenance fee of $58,000 based on the Hotel's representation that the Kwok family would receive the highest possible service, including public safety related services.

44.     Also on March 6, 2015, Genever entered into a Maid's Lease with the Hotel (collectively, the "Leases").   This lease contains the same provisions as the Proprietary Lease. (*See* Exhibit B).

**Unit 18's Terraces.**

45.     Unit 18's terraces were installed prior to Genever's execution of the Leases.

46.     Plaintiffs have not made any alterations or improvements to Unit 18's terraces.

47.     Upon information and belief, Unit 18's prior owner did not make any alterations or improvements to Unit 18's terraces.

48.     Upon information and belief, prior to the alleged water related damages at issue, there has never been an incident, or even accusation, that Unit 18's terraces had caused water damage to other apartments.

49.     Upon information and belief, the Hotel and/or Management never inspected the condition of Unit 18's terraces in connection with Plaintiffs' purchase of Unit 18.

50.     Neither Plaintiffs nor the Hotel performed any maintenance or repair work on Unit 18's terraces between March 6, 2015 and May 29, 2016.  During that time period, numerous rainstorms and snowstorms occurred and no problems were experienced with the terraces, and no leaks occurred.

## May 2016 New York City Rainstorm.

51.     Upon information and belief, on or about May 29, 2016, there was a rainstorm in New York City.

52.     On or about the following day, May 30, 2016, Hotel representatives entered Unit 18 without obtaining Plaintiffs' permission and directed a construction company (Defendant Gustav) to perform construction related work on Unit 18's terraces.

53.     On or about May 31, 2016, the day after the Hotel representatives had already entered Unit 18, Management emailed Genever's agent advising that they were accessing Unit 18 because a "leak" had occurred that needed to be repaired.  This innocuous email gave no information about the source, type or severity of the leak or that any substantial work would be required.

54.     Later the same day, the Hotel sent a follow up email that "[t]hey [were] still investigating the source of the leak," and wanted to check the "pavers, flashings and drain lines

on the terrace." The email closed with the following: "We will keep you updated to our findings."

55.     On June 1, 2016, Management hired City and Suburban to run a camera throughout the drain lines on the 18th floor and found the drains to be in "good shape."

56.     It was not until June 2, 2016, that the Hotel, through Defendant Wiener, communicated again with Genever's agent to tell her "a water leak [that] originated from the 18[th] floor" may "have caused a lot of damage, as well as the cleaning of the roof terrace."

57.     During a telephone discussion with Genever's agent later that day, Defendant Wiener advised Genever's agent to contact its insurer.

58.     Unbeknownst to Plaintiffs, Management had met with a contractor on June 2, 2016 and directed the contractor to remove a section of pipe leading to a terrace on Unit 18.

59.     When the Hotel was questioned about why Plaintiffs were not notified about the severity of the situation and the need to perform repairs earlier, the Hotel responded that there was "no time because other residents of the Hotel were complaining about the leak."

60.     Upon information and belief, Management relied upon only one company to inspect and conduct the work performed on Unit 18.

61.     Upon information and believe, Management failed to conduct a proper causation analysis.

62.     Upon information and belief, Management did not seek a second opinion or obtain alternative estimates for the work that was performed.

63.     Despite never having advised Plaintiffs that substantial work would be performed on Unit 18, the Hotel engaged in an extensive demolition effort which involved numerous workmen tearing up the Unit 18 terraces' paving stones and then effecting supposed "repairs,"

incurring costs in excess of thirty thousand ($30,000) dollars and resultant damages to Unit 18 and its contents.

64.     The damages included, but were not limited to: (1) a large hole in the exterior wall where a drain pipe was removed; (2)  a hole in the apartment's interior wall caused by negligent handling of a snake or camera being used to determine the condition of the drain pipe; (3) damage to a hand-painted canvass covering a portion of a wall in which a hole was drilled and from which water from the defective drain pipe leaked; (4) damages to large sections of the apartment's antique carpeting next to the wall where the leak occurred; (5) damages to the floor molding of the interior wall; (6) the removal of Plaintiffs' valuable personal belongings and several artifacts kept in display cases in the apartment which are now missing; and (7) cracks and/or other damage to the irrigation system for the plants on the terraces.

65.     Plaintiffs representatives have confirmed that in the days and weeks prior to the circa May 29, 2016 trigger date for the instant dispute, the aforementioned missing belongings and artifacts were present in their display cases and the terraces' irrigation system had been functioning properly.  The plants appeared healthy.

66.     After the Hotel's and/or Management's contractors began entering and working on Unit 18, Plaintiffs' representatives observed missing belongings and artifacts and noticed that the majority of the plants on the terraces were in a state of serious disrepair.  Whatever plants remained were in poor health.

67.     In Chinese culture, great emphasis is placed on one's ability to care for plants within his/her possession.  A person's reputation, and the amount of respect due and owing that person, can be affected by how he cares for his plants.  The condition of those plants provide a reflection of the person charged with maintaining their health and vitality.

68.     After learning that Unit 18's irrigation system had been damaged, the Hotel provided Plaintiffs with an estimate to repair the irrigation system that was approximately five times higher than an estimate one of Plaintiffs' representatives had obtained.

69.     All of the construction work and accessing of Unit 18 was done without proper notice to or the consent of Plaintiffs, despite the Kwok family being known to the Hotel as a family that is world-renowned in the business of real estate development and construction, and who would have been particularly well situated to mobilize experts in the field to examine the leak and determine its source as well as the most efficient and least damaging way to repair it.

70.     Instead, without any real notice or consultation, Management went ahead and authorized the extensive work on Unit 18 for more than three days without further notice or authorization from Plaintiffs.

**Architect's & Construction Consultant's Initial Assessment**

71.     At or around the time that the Hotel began hiring contractors to work on Plaintiffs' apartment, Plaintiffs asked an architect who was already very familiar with the Building to come to their apartment to inspect the allegedly problematic terraces.

72.     The architect, along with her construction consultant, inspected Plaintiffs' apartment and concluded that their terraces could not have been responsible for the water damage the Hotel has alleged they caused.

73.     Instead, while standing on one of the apartment's terraces, the consultant stated that he would be concerned about the integrity of the mortar and the stability of the bricks and ornamental stones on the south wall of the Hotel, all of which pose a danger to the Hotel's residents and members of the public.

13

74.     In the time since those observations, Plaintiffs have found fallen debris from the Building's façade on their terraces.  Plaintiffs are concerned that the Hotel's structural integrity may not be sound.

75.     Upon information and belief, the architect and/or consultant noted that based upon her observations, the Hotel should conduct a full inspection of the south wall.

**Insurance Company's Investigation of Unit 18 & Alleged Damages.**

76.     On or about June 7 2016, an insurance adjuster from Genever's insurance company (Chubb National Insurance Co.) inspected Unit 18 and the alleged water damages at issue (the "Adjuster").

77.     On or about June 8, 2016, the Adjuster emailed an estimate of repairs to Genever's agent and Defendant Wiener.  In the email, the adjuster explained that the "water damage seems to be a result from the building line <u>above</u> [Unit] 18."

78.     The Adjuster detailed his findings in an email, dated June 22, 2016.  (*See* Exhibit C).  In the email, the Adjuster explained that Unit 18's terraces did not cause the alleged water damage at issue; instead, a clogged drain stack pipe, for which the Hotel is responsible, was the cause.  (*Id.*).  In fact, the Adjuster explicitly stated that he inspected the terraces and "saw no sign of [a] leak issue."  (*Id.*).  The Adjuster concluded that "it is obvious that the leak came from the drain pipe running above [Unit] 18."  (*Id.*).

79.     In particular, the Adjuster made the following critical findings:

   a. "[Unit 18's] exterior wall had been opened to find the drain pipe[,] inside such wall [w]as the obvious source of the water leak.";

   b. The terrace itself showed no sign of a leak issue without the sign of any water or moisture.;

   c. The Adjuster concluded that none of the work performed on the exterior terrace was necessary as "none of this was the cause of the

14

leak.  The drain stack pipe [located] behind the wall and running up and above [Unit] 18" was the cause.;

d.  Management's    decision    to    "'fix'    the    terrace membrane/underlayment" by a "change/alter/upgrade" was not approved or directed by the insurance company.;

e.  "[T]he terrace was not the cause of the leak to units below.";

f.  "[T]he repairs were upgrades to something not damaged.";

g.  Management's incident reports confirm "an issue with the leaking drain stack.";

h.  A photograph of the removed drain stack pipe "confirms the source was not the [Unit] 18 terrace, but the drain stack."; and

i.  Management's conduct was "quite aggressive" and "such was done in lieu of properly identifying the actual cause of the leak, [which] the drain stack confirmed.  The expense to disassemble and rebuild [the Unit] 18 terrace was not needed, and my insured should not be responsible for this expense."

[(*Id.*)]

80.     The Adjuster also included the aforementioned photograph of the portion of the drain stack pipe that Management had replaced, which one can easily observe as having been severely corroded.  (*Id.*).

**The Hotel's Incident Reports.**

81.     The Hotel's own incident reports appear to confirm that Management mistakenly tore up Unit 18's terraces when in fact the cause of the alleged damages was not the terraces but a "leaking drain stack pipe," which ran down from the Building's roof.

82.     On June 2, 2016, Management issued an incident report, which notes that Management received a call on May 29, 2016, regarding a water leak in Units 1904, 1804, 1704, and 1604.  Shortly thereafter, Management went to check Unit 18's terraces.  The report further notes that on May 30, 2016, Management hired Gustav "to investigate the cause of the leak from

the 20th floor to 16th floor," and that Gustav removed the pavers from Unit 18's terraces. (Emphasis added)). Gustav claimed that the terraces' design resulted in a "slow[ing of] the water from running fast enough to a drain line," which led to water rising above the flashing and running to the apartments below. The report also discusses that Management hired City and Suburban on June 1, 2016, to run a camera through drain lines on the 18th and 20th floors, and that the drain lines were in "good shape." (*See* Exhibit D).

83.     In a subsequent incident report, dated June 7 2016, Management confirmed that on June 4, 2016, it "rained heavily" again and leaks that originated from two clogged drain lines on the 20th floor's terrace were discovered in both Unit 1704 and Unit 1904. Despite this, Management decided to have its contractor (City and Suburban) remove a section of pipe leading to Unit 18's terraces. The report states that the pipe, which is the aforementioned drain stack pipe that the Adjuster had taken a photograph of, had been completely clogged. The report also notes that City and Suburban's drain cleaners had damaged a wall in Unit 1804's dining room. (*See* Exhibit E).

84.     On or about June 20, 2016, Genever's agent received an invoice from Gustav for $33,520.58 without any prior notification or knowledge of the work the company had allegedly performed on Unit 18.

85.     Prior to receiving the invoice, Genever's representatives had been advised by the Hotel that Unit 18's terraces would be inspected – not that extensive construction related services would be performed on the terraces without their consent.

86.     At the time the invoice was provided to Plaintiffs, copies of the Hotel's incident reports were not included, suggesting that the Hotel was intending to conceal these facts in order

16

to obtain payment from Plaintiffs for work which should never have been performed in the first place or which the Hotel is responsible for.

87.     Further evidence of the fact that Unit 18's terraces were not the cause of the leak or alleged water damage was noted by the aforementioned construction consultant's observations and Adjuster's findings, and further corroborated by Management's incident reports, that there was substantial damage above the 18th floor caused by the leaking drain stack pipe which could not have been caused by Unit 18's terraces.

88.     Moreover, there have been several rainstorms since May 29, 2016, and there have been no accusations that Plaintiffs' two terraces that the Hotel demands be repaired immediately caused any water-related damages.

89.     On or about June 28, 2016, Hotel representatives, including Defendant Weiner, met with Genever representatives and confirmed that Management had entered Unit 18 on or about May 30, 2016.  The Hotel representatives, including Defendant Ullman, attempted to place all of the blame for the dispute at issue on Plaintiffs.  Eventually, Defendant Ullman apologized for not having notified Genever within forty-eight hours of the construction work that was performed on Unit 18.

### Imminent Harm

90.     Upon information and belief, Management is demanding that Plaintiffs tear up two of their terraces and reconstruct same immediately.  Plaintiffs, however, are still investigating the dispute at issue and, as noted, do not believe Unit 18's terraces caused the alleged water-related damages at issue.

91.     Upon information and belief, Management has taken the position that if Plaintiffs do not perform the work they are demanding (i.e., tearing up their terraces) and there is another

rainstorm similar to the one described in the Verified Complaint that the Hotel will hold Plaintiffs solely responsible for any damages that result to any property of any resident of the Hotel, which could amount to hundreds of thousands of dollars given the prestigious residents who reside in the Hotel and the value of their property located there.

92.     The Hotel continues to discriminate against Plaintiffs by requiring that they pay into escrow an additional two years' worth of maintenance fees.  Plaintiffs have been informed that no other Hotel resident has been required to pay five years' worth of fees.

**Management's Unauthorized Entry of Unit 18 & General Misconduct.**

93.     Upon information and belief, Management has entered or sought to enter Unit 18 on several other occasions without notice and without a representative of Plaintiffs present despite the fact that no emergency existed.

94.     The Kwok family is concerned about their safety due to Management's history of entering his apartment with outside personnel without prior notice and in the absence of Plaintiffs' consent.  Management's conduct is extremely troubling to the Kwok family and raises, among other things, serious safety and security concerns, especially in light of the Hotel's and Management's misconduct with respect to the dispute at issue.

95.     This recent misconduct by Management is merely one in a series of actions that Plaintiffs have observed during their brief period as residents in the Hotel.

96.     Examples of Management services that fell below those expected from a building that represents its services to be of the highest quality include repeated failures to restore hot water to Unit 18 despite numerous requests, failures to repair loose door knobs, and general disrespectful behavior when dealing with the Kwok family.

97.     Genever representatives have confirmed with other Hotel residents that they have observed similar improper actions by Management and have similar concerns of Management's ability to provide the first class level of service required by a luxury hotel and cooperative apartment building of this stature, and which, quite frankly, owners pay top dollars for.

### Plaintiffs' Attempts to Resolve this Dispute Amicably.

98.     Prior to filing the instant action, on July 19, 2016, this office issued and hand-delivered a letter to the Hotel, Management, and each member of the Board of Directors detailing the claims we believe existed at that time.

99.     Having not received a response, this office issued a follow up email to the Hotel on or about July 26, 2016.  No one from the Hotel responded to the email.

100.    On August 1, 2016, Genever's agent issued another follow up email to the Hotel. No substantive response was received to any of those emails.

101.    It was not until the eve of filing this action that any response was received and based on that response it appeared clear that this dispute was not going to be resolved without a court determining the parties' rights.  Given the emergent nature of the claims at issue, Plaintiffs filed this complaint.

### COUNT I
### (Breach of Contract Against the Hotel)

102.    Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

103.    On March 6, 2015, Genever and the Hotel entered into the Proprietary Lease and Maid's Lease.  Genever fully performed its obligations under the Leases by rendering payment to the Hotel in connection with the Leases.

19

104.   In or around May to June 2016, the Hotel and Management directed City and Suburban and Gustav to perform so-called "repair" work on Unit 18, after erroneously concluding that the terraces had caused water damage to apartments above and below the apartment.

105.   A subsequent report issued by Plaintiffs' Adjuster conclusively found that Plaintiffs' terraces did not cause any alleged water damage; instead, the Building's drain stack pipe had been clogged and began to leak.

106.   The Hotel has materially breached its obligations under the Leases by, among other things, failing to maintain and repair parts of the Building as required by the Leases' provisions.

107.   Section 2.1 of the Proprietary Lease provides that the Lessor (i.e., the Hotel) "shall keep in good repair the Building's foundations, sidewalks, walls, . . . supports, beams, roofs, gutters, fences, cellars, chimneys . . . and all main and principal pipes for carrying water, gas or steam through the Building and all drain pipes . . . together with all plumbing, heating and other apparatus intended for the general service of the Building." (Exhibit A, at 4 (emphasis added)). Section 2.1 further provides that "all repairs required to be made by the Lessor shall be at the expense of the Lessor, unless the same shall have been rendered necessary by the wrongful act or neglect or carelessness of the Lessee . . . ."  (Id. (emphasis added))

108.   Section 2.5 of the Proprietary Lease provides that the Lessor (i.e., the Hotel) is obligated to maintain and repair the terraces: "It shall be the Lessor's duty to keep the Terrace in good repair, subject to reasonable wear and tear and the provisions contained in this paragraph. (See Exhibit A, at 6.)

109.    Section 3.15 of the Proprietary Lease provides that the Lessee's (i.e. Genever) duty to make repairs "shall not include . . . water or other pipes or conduits within the walls, ceilings or floors . . . which is part of the standard Building equipment." (Exhibit A, at 14-15).

110.    The Maid's Lease's provisions are identical to those of the Proprietary Lease.

111.    It is undisputed that there is no evidence that Plaintiffs altered the terraces in question and there is no evidence that Plaintiffs had any responsibility for the failure of the Building's drain stack pipe, which the Lessor (i.e., Hotel) is responsible to repair.

112.    Plaintiffs have also observed fallen debris from the Building's exterior façade on their terraces.

113.    Accordingly, it is clear from the foregoing that the Hotel has breached the Leases by, among other things: (a) failing to maintain the Building's drain pipes in workable condition, (b) failing to maintain the Building's exterior in good repair, and, to the extent that any "repairs" were needed to Unit 18's terraces, (c) failing to maintain the terraces in good repair.

114.    As a result of the Hotel's and Management's material breaches of the Leases, Plaintiffs have been injured in numerous ways, including incurring expenses in dealing with the alleged damages at issue, such as invoices for the work that Management directed be performed without Plaintiffs' permission or knowledge, and all consequential damages, including without limitation, Plaintiffs' expert and professional fees in connection with responding to the improper and unlawful demands made by Management.

115.    Plaintiffs are entitled to an injunction and judgment against the Defendants for damages in an amount to be determined by the Court.

## COUNT II
## (Breach of the Implied Covenant of Good Faith and Fair Dealing Against the Hotel)

116.   Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

117.   The Leases contain provisions that identify the Hotel's and Management's responsibilities with respect to the Building's maintenance and repairs within the Hotel's province.

118.   Genever fully performed its obligations under the Leases by rendering its payments.

119.   In exchange, Plaintiffs expected the Hotel and Management to adhere to the Leases' provisions and maintain the portions of the Building for which lessees (i.e., residents) were not responsible for.

120.   Instead, the Hotel arbitrarily and unreasonably failed to properly maintain the Building's drain stack pipe and Unit 18's terraces in good repair.

121.   In so doing, the Hotel and Management have taken advantage of their position to control implementation of the Leases' terms by not only improperly seeking to pass the costs that they are responsible for (e.g., the unnecessary repairs to Unit 18's terraces) on to Plaintiffs, but also instructing Plaintiffs to tear up their terraces and repair them to avoid additional charges in connection with future water damage that may allegedly be caused by Unit 18's terraces.

122.   Plaintiffs are entitled to an injunction and judgment against the Defendants for damages in an amount to be determined by the Court.

## COUNT III
### (Unlawful Discrimination in Violation of 42 U.S.C. 3604(b) Against the Hotel)

123.    Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

124.    The Hotel has required Mr. Kwok, a Chinese citizen and foreign national, to pay an additional two years' (for a total of five years) worth of substantial maintenance fees in connection with his execution of the Leases, bringing the total to $3,000,000 in escrow.

125.    Upon information and belief, the usual arrangement is that the Hotel requires its residents to pay only three years' worth of maintenance fees.

126.    Upon information and belief, the Hotel never offered Mr. Kwok the same three years' worth of fees arrangement that it has offered every other resident.

127.    Upon information and belief, Mr. Kwok is the only resident of the Hotel who has been required to pay five years' worth of fees and is the only Chinese resident.

128.    In so doing, the Hotel has offered Mr. Kwok different or less favorable terms than the other residents of a different "race [and/or] color."

129.    Accordingly, the Hotel has violated the Fair Housing Act by discriminating against the Kwok family, and in particular Mr. Kwok who is a foreign national, "in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race [or] color," in violation of 42 U.S.C. § 3604(b).

## COUNT IV
### (Unlawful Discrimination in Violation of the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 296, Against the Hotel)

130.    Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

131.    The Hotel has required Mr. Kwok, a Chinese citizen and foreign national, to pay an additional two years' (for a total of five years) worth of substantial maintenance fees in connection with his execution of the Leases, bringing the total to $3,000,000 in escrow.

132.    Upon information and belief, the usual arrangement is that the Hotel requires its residents to pay only three years' worth of maintenance fees.

133.    Upon information and belief, the Hotel never offered Mr. Kwok the same three years' worth of fees arrangement that it has offered every other resident.

134.    Upon information and belief, Mr. Kwok is the only resident of the Hotel who has been required to pay five years' worth of fees and is the only Chinese resident.

135.    In so doing, the Hotel has offered Mr. Kwok different or less favorable terms than the other residents of a different "race [and/or] color."

136.    Accordingly, the Hotel has violated the NYSHRL by discriminating against the Kwok family, and in particular Mr. Kwok who is a foreign national, "in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or in the furnishing of facilities or services in connection therewith," based on "race [or] creed," in violation of N.Y. Exec. Law § 296(5).

## COUNT V
### (Unlawful Discrimination In Violation of the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-107, Against the Hotel)

137.    Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

138.    The Hotel has required Mr. Kwok, a Chinese citizen and foreign national, to pay an additional two years' (for a total of five years) worth of substantial maintenance fees in connection with his execution of the Leases, bringing the total to $3,000,000 in escrow.

139.    Upon information and belief, the usual arrangement is that the Hotel requires its residents to pay only three years' worth of maintenance fees.

140.    Upon information and belief, the Hotel never offered Mr. Kwok the same three years' worth of fees arrangement that it has offered every other resident.

141.    Upon information and belief, Mr. Kwok is the only resident of the Hotel who has been required to pay five years' worth of fees and is the only Chinese resident.

142.    In so doing, the Hotel has offered Mr. Kwok different or less favorable terms than the other residents of a different "race [and/or] color."

143.    Accordingly, the Hotel has violated the NYCHRL by discriminating against the Kwok family, and in particular Mr. Kwok who is a foreign national, "in the terms, conditions or privileges of the sale, rental or lease of any such housing accommodation or an interest therein or in the furnishing of facilities or services in connection therewith," based on "race [or] creed," in violation of N.Y.C. Admin. Code § 8-107(5)(a).

### COUNT VI
### (Negligence Against the Hotel, Ullman, Wiener, and John and Janes Does 1 - 10)

144.    Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

145.    In or around May to June 2016, the Hotel and Management accessed Plaintiffs' apartment and terraces without obtaining Plaintiffs' consent, and directed both City and Suburban to perform drain pipe related services and Gustav to perform so-called "repair" work on the terraces, after erroneously concluding that the terraces had caused water damage to apartments above and below Unit 18.

146.    Neither Plaintiffs, nor any of their agents, were ever present in the apartment during the Hotel's and Management's visits around this time period in connection with the alleged water damages at issue.

147.    The Hotel, Management, Ullman, and Wiener Defendants were responsible, in one form or another, to maintain the Building's drain pipes and terraces in good repair and to exercise reasonable care in effectuating any repairs within their province.

148.    These Defendants breached their duty to exercise reasonable care by negligently entering Plaintiffs' apartment to inspect and conduct and/or oversee repair work performed in the apartment and on its terraces.

149.    As a direct and proximate result of these Defendants' negligent conduct, Plaintiffs have suffered the following damages, among others:

> (a) a large hole in the exterior wall where a drain pipe was removed;
>
> (b) a hole in the apartment's interior wall caused by negligent handling of a snake or camera being used to determine the condition of a drain pipe;
>
> (c) damage to a hand-painted canvass covering a portion of a wall in which a hole was drilled and from which water from the defective drain pipe leaked;
>
> (d) damages to large sections of the apartment's antique carpeting next to the wall where the leak occurred;
>
> (e) damages to the floor molding of the interior wall;
>
> (f) the removal of several valuable personal belongings and artifacts kept in display cases in the apartment which are now missing; and
>
> (g) cracks and/or other damage to the irrigation system for the plants on the terraces.

150.   Plaintiffs are entitled to an injunction and judgment against the Defendants for damages in an amount to be determined by the Court.

## COUNT VII
### (Negligence Against Gustav, XYZ Corporations 1 – 10, and John and Jane Does 1 - 10)

151.   Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

152.   In or around May to June 2016, the Hotel and Management accessed Plaintiffs' apartment and terraces without obtaining Plaintiffs' consent, and directed both City and Suburban to perform drain pipe related services and Gustav to perform so-called "repair" work on the terraces, after erroneously concluding that the terraces had caused water damage to apartments above and below Unit 18.

153.   Upon information and belief, City and Suburban accessed Plaintiffs' apartment in or around end the of May or early June 2016.

154.   Upon information and belief, Gustav accessed Plaintiffs' apartment towards the end of May and into early June 2016.

155.   Neither Plaintiffs, nor any of their agents, were ever present in the apartment at the same time as City and Suburban or Gustav.

156.   These Defendants owed a duty to Plaintiffs to exercise reasonable care in accessing Plaintiffs' apartment and rendering construction related services.

157.   These Defendants breached that duty by failing to exercise the requisite degree of care and skill expected of their respective trades by, among other things, failing to protect Unit 18's furnishings from damages unrelated to the alleged water leaks at issue and putting holes in the apartment's interior walls.

27

158.   As a direct and proximate result of these Defendants' negligent conduct, Plaintiffs

have suffered the following damages, among others:

> (a) a large hole in the exterior wall where a drain pipe was removed;
>
> (b) a hole in the apartment's interior wall caused by negligent handling of a snake or camera being used to determine the condition of a drain pipe;
>
> (c) damage to a hand-painted canvass covering a portion of a wall in which a hole was drilled and from which water from the defective drain pipe leaked;
>
> (d) damages to large sections of the apartment's antique carpeting next to the wall where the leak occurred;
>
> (e) damages to the floor molding of the interior wall;
>
> (f) the removal of several valuable personal belongings and artifacts kept in display cases in the apartment which are now missing; and
>
> (g) cracks and/or other damage to the irrigation system for the plants on the terraces.

159.   Plaintiffs are entitled to an injunction and judgment against the Defendants for

damages in an amount to be determined by the Court.

## COUNT VIII
### (Conversion Against All Defendants)

160.   Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as

if fully set forth herein.

161.   Plaintiffs' own several valuable personal belongings and artifacts and items that

are displayed in cases throughout their apartment.  Plaintiffs have exclusive ownership rights to

those items and, as such, possession of same.

162.   In or around May to June 2016, the Hotel and Management accessed Plaintiffs' apartment and terraces without obtaining Plaintiffs' consent, and directed both City and Suburban to perform drain pipe related services and Gustav to perform so-called "repair" work on the terraces, after erroneously concluding that the terraces had caused water damage to apartments above and below Unit 18.

163.   Neither Plaintiffs, nor any of their agents, were ever present in the apartment during Defendants' visits around this time period in connection with the alleged water damages at issue.

164.   Upon returning to the apartment after each of the Defendants had accessed the apartment and/or performed so-called "repair" work, Plaintiffs observed valuable personal belongings and artifacts missing from the apartment's display cases.

165.   The missing items have not been returned to Plaintiffs.

166.   Defendants' illegal conduct has directly interfered with Plaintiffs' exclusive ownership rights by depriving Plaintiffs (i.e., owners) of their property by unauthorized acts, in assuming dominion and control over Plaintiffs' property.

### COUNT IX
### (Breach of Statutory Warranty of Habitability Against the Hotel, Ullman, Weiner, and John and Jane Does 1 - 10 )

167.   Plaintiffs hereby repeat and reallege the foregoing Paragraphs of the Complaint as if fully set forth herein.

168.   New York Real Property Law 235-b created a statutorily mandated warranty of habitability in every residential lease, including the covenant that dwelling premises shall "not be subjected to any conditions which would be dangerous, hazardous or detrimental to [a tenant's] life, health or safety."

169.   In light of the statutory requirement that the premises be "fit for the uses reasonably intended by the parties," New York courts have held the warranty is breached even if damage to the tenant's unit is not life-threatening, but impedes the tenant's reasonable expectations or receipt of "amenities . . . consistent with the nature of the bargain." *Solow v. Wellner*, 150 Misc. 2d 642, 650 (Civ. Ct. 1991). "The location of the premises, the amenities that are touted to go with the apartment, and representations made by the landlord consistent with the lease are all factors that enter into a tenant's reasonable expectations." *Id.*

170.   Given the Hotel's location (Fifth Avenue), touted amenities ("elite," luxury," and "superb" per the Hotel's own website), and representations about the exquisite condition and maintenance of the Building and Unit,  Plaintiffs justifiably believed that the Hotel and its Management would properly rectify unsafe and other uninhabitable conditions at its own expense, consistent with its statutory and contractual obligations.  Instead, the Hotel has allowed unknown persons to abscond with Plaintiffs' personal property during their unnoticed entry, has allowed apparent structural damage to go unchecked despite the obvious threat to Plaintiffs', other tenants', and the general public's safety, and both allowed and caused considerable damage to Plaintiffs' terrace.

171.   The Hotel, Ullman, and Wiener Defendants were responsible, in one form or another, to maintain the Building's drain pipes and terraces in good repair and to exercise reasonable care in effectuating any repairs within their province.

172.   These Defendants breached their duty to exercise reasonable care by negligently entering Plaintiffs' apartment to inspect and conduct and/or oversee repair work performed in the apartment and on its terraces.

173.   As a direct and proximate result of these Defendants' negligent conduct, Plaintiffs have suffered the following damages, among others:

(a) a large hole in the exterior wall where a drain pipe was removed;

(b) a hole in the apartment's interior wall caused by negligent handling of a snake or camera being used to determine the condition of a drain pipe;

(c) damage to a hand-painted canvass covering a portion of a wall in which a hole was drilled and from which water from the defective drain pipe leaked;

(d) damages to large sections of the apartment's antique carpeting next to the wall where the leak occurred;

(e) damages to the floor molding of the interior wall;

(f) the removal of several valuable personal belongings and artifacts kept in display cases in the apartment which are now missing;

(g) cracks and/or other damage to the irrigation system for the plants on the terraces; and

(h) missing personal property.

174.   Plaintiffs are entitled to an injunction and judgment against the Defendants for damages in an amount to be determined by the Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Genever and Mr. Kwok respectfully request judgment as follows:

1.   Plaintiffs may continue to pay the monthly maintenance fees less any actual charges due and owing to the Hotel into Plaintiffs' attorneys' escrow account pending resolution of this matter.

2.      The Hotel, at its own expense, engage an independent expert to evaluate the structural integrity of the Hotel's south wall and to render a report to Plaintiffs and the Court.

3.      Defendants and their respective partners, agents and employees, and any and all other persons in active concert or participation with Defendants, are preliminarily and permanently enjoined from:

  a.  entering Plaintiffs' apartment without Plaintiffs' notice and consent, and performing any work on the apartment, including its terraces;

  b.  requiring that Plaintiffs pay Defendant Gustav's invoice;

  c.  requiring that Plaintiffs perform additional construction related services on their apartment's terraces; and

  d.  unlawfully discriminating against Plaintiffs by retaining five years' worth of escrowed maintenance fees instead of the customary three years and accordingly requiring the Hotel to refund such excess fees to Plaintiffs.

4.      The Parties are to participate in reciprocal expedited discovery in aid of Plaintiffs' requested injunctive relief.

5.      Defendants are found to be liable for:

  a.  Breach of contract;

  b.  Breach of the implied covenant of good faith and fair dealing;

  c.  Unlawful discrimination under 42 U.S.C. 3604;

  d.  Unlawful discrimination under N.Y. Exec. Law § 296(5);

  e.  Unlawful discrimination under N.Y.C. Admin. Code § 8-107(5)(a); *and*

  f.  Negligence causing damages to Plaintiffs' property;

  g.  Conversion; and

  h.  Breach of the statutory warranty of habitability.

6.    Defendants are to pay Plaintiffs compensatory and punitive damages in an amount to be proven by the Court, including, but not limited to, expenses incurred to date in dealing with the alleged water leaks which were not caused by Plaintiffs' terraces, expenses to repair the damages to the interior of Plaintiffs' apartment that Defendants negligently caused, and the value of the items that are missing from Plaintiffs' display cases.

7.    Defendants are to pay Plaintiffs the costs of this suit, including reasonable attorneys' fees, by virtue of the exceptional circumstances of this case and/or due to Defendants' willful misconduct.

8.    Any other relief as this Court may deem just and proper.

Respectfully submitted,

Dated: August 5, 2016

By: _____
David S. Stone
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (908) 464-3010

33

## VERIFICATION

STATE OF NEW YORK      )
                       ) ss.
COUNTY OF NEW YORK )


Yvette Wong, being first duly sworn upon her oath, deposes and states that she has read and reviewed the foregoing Verified Complaint, and that, as to all factual allegations contained therein, those facts are true and correct according to her own knowledge, or she has been informed as to those facts not within her personal knowledge, that they are true and correct, and that, based thereon, she believes them to be true.

_____
Yvette Wong


SUBSCRIBED and SWORN to before me this 5 day of August, 2016.


_____
Notary Public

**DEBORAH L WISMER**
ID #50018721
NOTARY PUBLIC
STATE OF NEW JERSEY
My Commission Expires July 7, 2020

My Commission Expires:

July 7, 2020

{00094363;v4}